# United States Court of Appeals
### FOR THE
### SECOND CIRCUIT
## JUDGMENT

At a stated Term of the United States Court of Appeals for the Second Circuit, held at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, in the City of New York, on the 23rd day of May, two thousand and seven.

Before:    Hon. Sonia Sotomayor,
           Hon. Barrington D. Parker,
                                 *Circuit Judges,*

           Hon. Mark R. Kravitz,
                                 *District Judge.*[*]

Docket Nos. 03-1737-cr(L), 03-1765-cr(CON)

---

UNITED STATES OF AMERICA,

        *Appellee,*

v.

ROBERT J. AMICO, RICHARD N. AMICO,

        *Defendants-Appellants.*

---

Appeal from the United States District Court for the Western District of New York.

This cause came on to be heard on the transcript of record from the United States District Court for the Western District of New York and was argued by counsel.

On consideration whereof, it is hereby ORDERED, ADJUDGED and DECREED that the judgment of said District Court be and it hereby is VACATED and the case is REMANDED for further proceedings in accordance with the opinion of this Court.

                                FOR THE COURT:
                                THOMAS W. ASREEN, Acting Clerk
                                by

                                Arthur M. Heller
                                Motions Staff Attorney

---

[*] The Honorable Mark R. Kravitz, Judge of the United States District Court for the District of Connecticut, sitting by designation.

ISSUED AS MANDATE: 7-27-07

A TRUE COPY
Catherine O'Hagan Wolfe, Clerk
by _____ DEPUTY CLERK

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2006

(Argued: December 11, 2006     Decided: May 23, 2007)

Docket Nos. 03-1737-cr(L), 03-1765-cr(CON)

UNITED STATES OF AMERICA,

*Appellee*,

— v. —

ROBERT J. AMICO, RICHARD N. AMICO,

*Defendants-Appellants*.

Before:

SOTOMAYOR, B.D. PARKER, *Circuit Judges*,
and KRAVITZ, *District Judge*.[*]

Appeal from judgments of conviction in the United States District Court for the Western District of New York (Siragusa, *J.*). Vacated and Remanded.

---

[*] The Honorable Mark R. Kravitz, United States District Court Judge for the District of Connecticut, sitting by designation.

NATHAN S. DERSHOWITZ, Dershowitz, Eiger & Adelson, P.C., (Victoria B. Eiger, *on the brief*), New York, N.Y., *for Defendant-Appellant Richard N. Amico.*

MATTHEW R. LEMBKE, Cerulli, Massare & Lembke, Rochester, N.Y., *for Defendant-Appellant Robert J. Amico.*

JOHN-ALEX ROMANO, United States Department of Justice, (Terrance P. Flynn, United States Attorney for the Western District of New York, Richard Resnick, Assistant United States Attorney, *on the brief*), Washington, D.C., *for Appellee United States of America.*

BARRINGTON D. PARKER, *Circuit Judge:*

Robert J. Amico ("Robert Jr.") and Richard N. Amico appeal from judgments of conviction in the United States District Court for the Western District of New York (Siragusa, *J.*) on charges arising from a mortgage fraud scheme. Robert Jr. was convicted of a variety of financial crimes, including mail fraud, tax evasion, and conspiracy. His brother Richard was convicted on one count each of mail fraud, tax evasion, and conspiracy. During proceedings before the district court, as well as on appeal, the Amicos contend, principally, that the district judge should have recused himself because his handling of, and reaction to, his prior dealings with the government's main cooperating witness concerning a mortgage application for the judge created an appearance of partiality. We conclude that they are correct, and that recusal was required. *See* 28 U.S.C. § 455(a). Accordingly, the judgments of conviction are vacated.

This appeal deals exclusively with the appearance of partiality. Nothing we say should be understood to conclude—or to imply—that the district judge engaged in misconduct concerning the application. This appeal centers around the issue of recusal, a small facet of the proceedings below. Our need to discuss the issue in some detail should not obscure the fact that, during a long and complicated case, the district judge addressed the many other issues and problems presented to him with considerable skill and professionalism. But we do find that, as problems surrounding the application evolved, an appearance of partiality arose that made it inappropriate for him to continue to preside. *See Chase Manhattan Bank v. Affiliated FM Ins. Co.*, 343 F.3d 120 (2d Cir. 2003).

In addition to recusal, several other issues are raised. Since further proceedings will be required, we address only those issues calling for guidance on remand. They are: (1) whether the judge improperly failed to require the recording of sidebar discussions and chambers conferences; (2) whether statements made by Robert Jr. to his Probation Officer in a prior case should have been suppressed; (3) whether the fraud charge was adequate; and (4) whether there was sufficient evidence to convict Richard of mail fraud.

**BACKGROUND**

In December 2000, the Amico brothers, their father, Robert A. Amico ("Robert Sr."), Patrick McNamara, and others were charged in a multiple count indictment with conspiracy to defraud banks and private mortgage lenders by falsifying loan applications and misrepresenting the

value of properties offered as collateral. The indictment also alleged that the defendants submitted false information on loan applications for borrowers, including themselves. The government alleged that Patrick McNamara, a mortgage broker, and Robert Sr., a builder, were the driving forces behind the scheme, which originated around 1993. During the course of the scheme, mortgages were obtained from various lenders on more than 100 homes based on false documentation. In many cases, the mortgage amounts were greater than the value of the properties being purchased. Some of the purchasers were apparently willing participants in the fraud, while others did not know that false information had been submitted on their behalf. At trial, Richard's main defense was that he was not involved in the scheme and that he too had been mislead by McNamara, who typically prepared false documents without Richard's knowledge.

In January 2001, McNamara entered into a plea agreement and agreed to cooperate, to fully disclose his criminal activity, and to testify. Because of his prominent role in the fraud, his cooperation and testimony were central to the government's case. Trial commenced on November 18, 2002.[1] On March 31, 2003, the jury convicted Robert Jr. of one count of engaging in a continuing financial crimes enterprise in violation of 18 U.S.C. § 225; one count of conspiracy to commit bank and mortgage fraud in violation of 18 U.S.C. § 371; four counts of mortgage fraud in violation of 18 U.S.C. § 1014; and sixteen counts of mail fraud in violation of 18 U.S.C. § 1341. Richard was convicted of one count of mail fraud in violation of 18

---

[1] In March 2003, Robert Sr. became severely ill. The court declared a mistrial as to him, and the trial continued against the remaining defendants. Robert Sr. died later that year.

U.S.C. § 1341 and one count of conspiracy to commit bank and mortgage fraud in violation of 18 U.S.C. § 371. In addition, Robert Jr. and Richard each pleaded guilty to one count of tax evasion in violation of 26 U.S.C. § 7206(1), and the remaining tax counts were dismissed.

The recusal issue arose from allegations by McNamara that he had helped prepare a fraudulent application in 1987—before the beginning of his scheme with the Amicos—for Judge Siragusa, who was then the First Assistant Monroe County District Attorney. Because the appearance of partiality stems from a cumulative series of events over a number of months, we review them in some detail. This review is complicated by the fact that during pre-trial proceedings, as well as during the trial itself, numerous chambers and side bar conferences were not recorded.

The issue first surfaced on January 10, 2002 when the government wrote the judge and defense counsel that "during a debriefing, . . . Patrick J. McNamara advised the government that he believes he assisted your honor in obtaining a mortgage loan in the late 1980s (years before he met Robert A. Amico)." McNamara's claim was addressed the next day, first in an unrecorded chambers conference and then in open court. Richard's attorney, Peter Jacobson Esq. (who does not represent Richard on this appeal) stated that, while he was not suggesting any impropriety on the judge's part, he believed that McNamara had falsified documents on numerous occasions without the borrower's consent and may have done so with the judge's mortgage application. The judge volunteered that the property he purchased was worth more than the loan he had obtained and, consequently, any examination of McNamara on this loan would be irrelevant because the

loans underlying the indictment involved inflated appraisals. The judge explained that he had no recollection of meeting McNamara, and assured the parties that "this will in no way affect [the judge's] ability to sit on the case." The judge concluded that, given the absence of evidence of any real conflict, "[r]ight now there's nothing to consider."

One week later, on January 18, 2002, counsel met with the judge in an unrecorded chambers conference. Although the precise exchange is disputed by the parties, the government informed the court that McNamara had changed his story. He was now claiming that in 1987 he had submitted a mortgage application on behalf of the judge which may have falsely indicated that the judge was married, when he was separated at the time—a fact that could have influenced his creditworthiness. During the conference, the judge called home and had a letter contained in his old divorce file faxed to chambers. The letter was sent to Gold Post Mortgage (Robert McNamara's employer at the time of the application), apparently accompanied by a copy of the judge's separation agreement, demonstrating that the broker was aware of his marital status. In view of the contents of the letter, the judge concluded McNamara's allegations were not an issue.

One week after this conference, the government wrote the court indicating that McNamara had changed his version of the events yet again. McNamara now stated that he was certain that he did *not* say that the judge was married on the application. In addition, the letter reminded the court that in the unrecorded January 18 conference, the government had disclosed that McNamara had told the government that while in detention between December 2000 and January 2001, McNamara had discussed the judge's application with Robert Sr. The government

requested that defense counsel be precluded from questioning McNamara at trial about the judge's application.

On April 23, 2002, Jacobson submitted a proposed subpoena to the court requiring Key Bank of New York, the lender to which Gold Post had forwarded the judge's application, to turn over its files relating to the judge's mortgage. In response, the court informed Jacobson in an off-the-record telephone conversation that the subpoena was too broad given the confidential nature of the information that could be disclosed.

The subpoena issue resurfaced at an unrecorded chambers conference on September 6, 2002. Jacobson told the judge that he would be subpoenaing the judge's entire mortgage file in an effort to ascertain whether McNamara had falsified the judge's application. By this time it was apparent that Jacobson was intent on pursuing this issue for the ostensible purpose of showing that McNamara had devised the scheme underlying the indictment prior to, and independently of, the Amicos' involvement. Although the record is unavailable, apparently Jacobson also raised the possibility of reassigning the case. Later, on the record, the judge expressed his disapproval of Jacobson's intention to subpoena the mortgage file and cautioned him that no basis existed for recusal.

On October 9, 2002, the court learned during a pretrial hearing that Robert Jr. also may have been privy to information regarding the judge's loan, well before the court was informed. At that time, a witness testified that Robert Jr. had stated to her on the day that he was arraigned that "the Judge had purchased homes through Pat McNamara . . . and they had a plan to go public with it, to get rid of that particular judge."

After learning from the U.S. Marshals that they had a subpoena for him, the judge retrieved certain files from the lender's attorney relating to the mortgage application. That file contained a number of documents concerning McNamara's allegations and the judge's responses to them. Of principal importance, the file included two conflicting documents—one, an unsigned, undated, and typed mortgage application prepared on the judge's behalf by Gold Post, and the other, a copy of the judge's March 1987 separation agreement. The unsigned mortgage application contained a number of apparent misrepresentations, including (i) listing the judge's marital status as "married" rather than "separated;" (ii) stating that the purchase will be for a tenancy by the entirety, whereas the judge's title was actually a fee simple; (iii) listing his marital home as his residence, as opposed to his then-current residence; and (iv) valuing his net worth by attributing to it the equity in the marital home. The application indicates through a checked box that the information was taken during a face-to-face interview. The file also contained two documents that imply that the unsigned loan application may never have been signed or sent to the lender: one, a letter to Gold Post Mortgage, verifying that the judge had sent them a copy of his separation agreement; and two, a hand-written unsigned application, as well as answers indicating that he had no alimony or support obligations. He allowed counsel to inspect, but, because of security considerations, not copy, the documents. The case had been garnering considerable media attention, and the judge also noted that

On October 15, 2002, the judge held a hearing concerning the content of the files. He noted that the "married" as opposed to the "separated" box had been checked on the unsigned application, as well as answers indicating that he had no alimony or support obligations. He allowed counsel to inspect, but, because of security considerations, not copy, the documents. The case had been garnering considerable media attention, and the judge also noted that

Jacobson had been improperly telling the press that an appearance of partiality existed.

On October 23, 2002, one week after viewing the mortgage files, the government wrote to the court, indicating that McNamara had again changed his story. This time, the government wrote that it:

anticipates that if asked questions regarding this issue at trial, McNamara would testify that it is his recollection that while working as a loan officer for Goldpost Mortgage, he created a handwritten loan application during his meeting with Your Honor at your office. . . . He believes that he indicated on the handwritten application that Your Honor was married (not separated), after discussing the issue of your marital status. He recollects explaining that if "separated" was marked, the lender would require a copy of a separation agreement. He would further testify that he believes Your Honor signed the . . . application. . . .

The government went on to write that if defense counsel were to cross-examine McNamara and bring up the alleged false loan application, it was possible that the judge could be called as a witness at trial. The government would therefore be filing a motion *in limine* to exclude any questioning of McNamara regarding the loan. The government's letter also stated that, were the defense to question McNamara regarding his conversation with Robert Sr. about the loan, "this may create an appearance of a conflict of interest."

On October 25, 2002, the parties assembled in court to address, in the judge's words, the "specter of conflict"

created by the information that had been disclosed. The judge went through a detailed chronology of the events involving McNamara that had unfolded. He also projected a number of his personal documents onto a screen for the purpose of demonstrating that his mortgage agreement with Gold Post indicated that the closing could not be scheduled until the company had received his separation papers.

The judge expressed his displeasure at the manner in which the government had handled an obviously delicate situation: "It offends me that the United States Attorney's Office is using a witness who it anticipates is lying." He instructed the government to do some "soul-searching" before putting McNamara on the stand. He stated that, "I'm trying to keep calm, but it's hard for me not to get a little emotional, as whenever anybody's integrity is challenged," and mentioned that he had spent sleepless nights thinking about the issue. The judge concluded that, based on the evidence that he presented refuting McNamara's claim, there was no need to recuse himself.

That same day, Robert Sr.'s counsel orally moved to preclude the testimony of McNamara. The government opposed the motion in writing, contending that his testimony was critical since he was "the only eyewitness to the entire mortgage fraud scheme" and the only "key player" on trial. The government conceded that McNamara was "at best, mistaken" about the judge's application and acknowledged that "the facts do not support McNamara's recollection of the events," but stated that it did not believe that he would perjure himself if called to testify. The government once again asked that the defense be precluded from questioning McNamara about the judge's mortgage, contending that because McNamara had falsified hundreds

2024

of loans in the past, such testimony would be, among other things, cumulative.

Less than two weeks before the scheduled trial date, the defendants formally moved for recusal on the grounds that there was an appearance of partiality and that it was likely that the judge would be called as a material witness. See 28 U.S.C. §§ 455(a), (b)(5)(iv). Two days later, having been instructed by the Assistant Attorney General in charge of the Criminal Division to either join the recusal motion or make its own motion, the government joined as to § 455(a).

At a hearing on November 8 on the recusal motion, the judge voiced his displeasure at this turn of events, and accused the government of being "disingenuous" for joining the defendants' motion. The judge denied the motion—initially, orally, and later in a written opinion—on the grounds that the motion was untimely and, in any event, without merit. According to the court, it was untimely because Robert Jr. would have known as early as December 2000 that McNamara was planning to allege that he had falsified the judge's loans, and because in January 2002, the government informed the court that McNamara was claiming that he had helped the judge prepare his loan application. In the alternative, the judge found the recusal motion to be without merit. He again went through a detailed chronology of when he was informed of McNamara's allegations and how he responded. The judge stressed that "it's as much my obligation to stay on this case if I should, as it is to get off of it if I should." He concluded, "a reasonable person, knowing all the facts, would conclude that this trial judge's impartiality could not reasonably be questioned . . . More damage to the justice system would be done by this Court recusing itself."

2025

On November 14, 2002, Jacobson submitted a petition for an emergency stay and a writ of mandamus from this Court, asking us to compel recusal. In response, the judge, through his law clerk, opposed the petition, highlighting the extent to which the judge believed the petition was "inaccurate, incorrect, misleading, or incomplete." On November 15, we denied the motion.

The controversy surrounding McNamara's allegations continued into the trial, which began on November 18. Before McNamara testified, the government asked once more that defense counsel be precluded from cross-examining McNamara about the judge's loan application. Two lengthy court sessions were spent analyzing the chronology of events in which the judge learned about McNamara's accusations and their relationship to McNamara's testimony. The judge deferred his ruling on the government's request until McNamara's direct examination had been completed.

On the morning that cross-examination of McNamara was to begin, the court announced its position on the testimony:

I will point out that with respect to the unsigned mortgage application, it was not secured by subpoena; it was secured by the Court. The Court obtained it at its own initiative, and the fact remains, and it should be pointed out, that the subpoena served by the defense yielded absolutely nothing. So but for the Court's attempt to really try to put this all out on the table and the Court's attempt to equally guard the rights of the defendant, we'd be back where we were at . . . [when] I produced the letter . . . . The issue is not whether something was done wrong or not, because I think

the Court has established without any doubt that the lender was fully apprised of the Court's marital status through the Court's initiative well before closing and well before the commitment letter. That's not the issue. The issue is did McNamara act in accordance with the cooperation agreement.

The judge then permitted defense counsel to cross-examine McNamara regarding the application to the extent that it related to the requirements of his plea agreement. The judge instructed McNamara to refer to him as an anonymous "judicial officer" rather than by name.

McNamara testified before the jury for nearly a month, and things did not go smoothly. During extended discussions and lengthy submissions over a variety of topics, including the judge's loan application, the judge pointed counsel to specific instances in which it appeared that McNamara's testimony concerning the loan was inconsistent with the government's pre-trial letters to the court, and questioned McNamara himself. The judge suggested on more than one occasion that defense counsel might "make a perjury motion" regarding McNamara's testimony, but counsel elected to wait until the testimony concluded. The judge, on his own initiative, "[did] some research on perjury." Ultimately, he concluded that McNamara was testifying falsely.

On the final day of cross-examination, defense counsel moved for a mistrial. This motion resulted in an extended discussion over the course of two days between the judge and counsel, in which the judge evaluated whether McNamara had committed perjury, and, if so, what the appropriate remedy should be. The government took the position that it did not concede that McNamara had com-

mitted perjury but that, if the court were to find that he did, the appropriate remedy would be a curative instruction rather than a mistrial. The discussion understandably became animated:

> The Government: You know what we're getting to, your Honor? We're getting to the fact that I'm on trial here, and I've been on trial here for a year now.
>
> The Court: Excuse me. Guess what, . . . the Court was on trial, too; and that's not the issue.

On January 16, 2003, the judge ruled that McNamara had committed perjury in his testimony regarding the judge's loan, and that the government should have known that false testimony would be adduced. The judge denied the motion for a mistrial, but decided that the jury should be instructed "as a matter of fact" that McNamara had committed perjury. The judge instructed the jury at the conclusion of McNamara's testimony and at the end of the trial that he had perjured himself concerning the "transaction with a judicial officer," as well as an unrelated incident in which he claimed to have observed Richard give a check to an attorney at a closing. The court further instructed the jury that they were free, but not required, to reject McNamara's entire testimony or to decide how much of his testimony to believe.

On April 3, 2003, the jury convicted Robert Jr. on all 22 counts, and convicted Richard of conspiracy and one count of mail fraud, but acquitted him on all other charges. Robert Jr. was sentenced to 210 months and Richard was sentenced to 108 months incarceration; both sentences were at the top of the (then mandatory) guidelines ranges. Robert Jr. and Richard were each ordered to make restitu-

tion of more than $14.5 million and to forfeit more than $56.8 million. Judge Siragusa declined to sentence McNamara and referred the sentencing to the Hon. Michael Telesca, who sentenced McNamara to 57 months, which included an eight-level substantial assistance departure.

This appeal followed. We vacate the convictions and remand for further proceedings.

## DISCUSSION

### a. Recusal

Title 28 U.S.C. § 455 provides in relevant part:

> (a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
>
> (b) He shall also disqualify himself in the following circumstances:
>
> (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding; . . .
>
> (4) He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

(5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person: . . . .

(iv) Is to the judge's knowledge likely to be a material witness in the proceeding.

28 U.S.C. § 455.

On appeal, the Amico brothers renew their contention that recusal was required under §§ 455(a) and (b)(5)(iv).[2] We review the denial of a motion under § 455(a) for abuse of discretion. *See United States v. Diaz*, 176 F.3d 52, 112 (2d Cir. 1999); *In re Certain Underwriter*, 294 F.3d 297, 302 (2d Cir. 2002).

*i Timeliness*

We turn first to the district court's finding that the November 6, 2002 motion for recusal was untimely. To ensure that a party does not "hedg[e] its bets against the eventual outcome" of a proceeding, a party must move for recusal "at the earliest possible moment after obtaining knowledge of facts demonstrating the basis for such a claim." *Apple v. Jewish Hosp. & Medical Center*, 829 F.2d 326, 333-34 (2d Cir. 1987). When evaluating timeliness, we look to four factors: whether "(1) the movant has participated in a substantial manner in trial or pre-trial proceedings; (2) granting the motion would represent a waste of judicial resources; (3) the motion was made after entry of judgment; and (4) the movant can demonstrate

---

[2] The Amicos argue for the first time on appeal that the judge should have recused himself under §§ 455(b)(1) and (b)(4). In addition, Richard claims that his draft plea agreement did not comport with Rule 11. Since we are vacating the judgments of conviction, we do not address these contentions.

2030

---

good cause for delay." *Id.* at 334 (internal citations omitted).

The judge found that the defendants had not raised recusal sufficiently early, since, in his view "[t]he record clearly indicates the defense was aware of McNamara's accusation almost two years before making its recusal motion." The judge relied on affidavits of Robert Jr. and the late Robert Sr. asserting that, while in detention, McNamara told them that he had falsified the judge's application. This conversation would necessarily have taken place before McNamara's release on January 12, 2001. It was a year later, on January 11, 2002, that the government told the court and defense counsel that McNamara was claiming that he had helped the judge falsify documents, and it was not until October 23, 2002 that the government first told the court that McNamara was accusing the judge of knowingly filing a false mortgage application.

Based on our review of the record, we conclude that the district judge abused his discretion when he found that the recusal motion was untimely. First, we are hard pressed to see how on the basis of the January 2001 conversation alone defense counsel could have documented an appearance of partiality. The record reflects that, as of that time, all defense counsel would have known is what McNamara had allegedly said while in detention. Neither Robert Jr. nor the court would have known whether McNamara was telling the truth regarding the existence of the mortgage application or his intention to accuse the judge. These facts created no basis for requesting reassignment based on an appearance of partiality under § 455(a), let alone of any actual conflict under § 455(b). A motion for recusal at that point would have had little substance and would have

2031

risked antagonizing the judge. As we explain below, our finding of the appearance of partiality is based not simply on McNamara's accusations, but on the judge's efforts over a number of months to deal with the escalating impact of those accusations.

A more substantial question is whether the defendants should have moved for recusal in January 2002, when the government first disclosed that McNamara claimed to have falsified the judge's loan application. A recusal motion at that point in time would have been problematic because McNamara had not yet accused the judge of *knowingly* filing a false loan application, and the months of highly charged court proceedings were just beginning. The fact that McNamara was claiming that he had falsified one loan application on behalf of the judge is not especially significant given that McNamara had falsified hundreds of applications in the past and the judge did not remember having dealt with McNamara. Indeed, the judge noted himself that by January 2002 McNamara's accusations against him constituted a "dead issue."

The fact that Jacobson subpoenaed the judge's loan application between January and October does not demonstrate that there was evidence to support recusal at the time, but, at best, that the parties were aggressively investigating the issue. The calculus changed on October 15 when the judge allowed counsel to inspect his mortgage file in chambers, and changed even more when, on October 26, the government wrote the court that McNamara had changed his story and was accusing the judge of knowingly filing a false mortgage application. It was also on October 23 that the government first requested that the court limit the cross-examination of McNamara in light of the pros-

2032

pect that defense counsel would attempt to call the judge a witness.

Regardless of the truth of McNamara's statements, once he told the government that the application was prepared with the judge's acquiescence and the defense announced that McNamara's testimony was important to show behavior that predated the conspiracy, the judge was presented with a new set of alternatives, all unpalatable. If he precluded the testimony, he exposed himself to accusation that his ruling was motivated by self-interest. If he admitted the testimony, he exposed himself to an accusation that placed in possible jeopardy his ability to continue to preside.

While we do not gainsay the difficulties of the choices facing the judge, we nonetheless conclude that he incorrectly weighed the four *Apple* factors in holding that the defendants should have filed the recusal motion in January 2002. *See* 829 F.2d at 333-34. While the motion was filed after two years of pretrial proceedings and just weeks before trial, the record reflects that from the first time that the government informed the court that McNamara claimed to have helped the judge falsify a loan, the issue was discussed at nearly every pretrial court appearance and often brought up by the judge *sua sponte*. It was only when the government informed the court and the defendants that McNamara was claiming that the judge had knowingly falsified his loan application that the defense moved for recusal and was joined by the government.

Accordingly, while the first two *Apple* factors — the substantial participation of the movant in pre-trial proceedings and the waste of judicial resources — indicate untimeliness, the third factor, the absence of a final judgment before the motion was filed, leans in the defen-

2033

dants' favor. More importantly, "[a]t the crux of the balancing" is the fourth factor, whether the movants can demonstrate good cause for delay. *United States v. Brinkworth*, 68 F.3d 633, 639 (2d Cir. 1995). Since this pivotal factor weighs decisively in favor of the defendants, we conclude that the district judge abused his discretion in determining under the *Apple* test that the recusal motion was untimely.

ii. *The Merits*

Section 455(a) requires that a judge recuse himself "in any proceeding in which his impartiality might reasonably be questioned." *Liljeberg v. Health Serv. Acquisition Corp.*, 486 U.S. 847, 859 (1988) (quoting 28 U.S.C. § 455(a)). While we credit the judge's explanation of what transpired with regard to his mortgage application, this test deals exclusively with appearances. Its purpose is the protection of the public's confidence in the impartiality of the judiciary.[3]

When Congress amended 28 U.S.C. § 455 in 1974 so as to eliminate a judge's "duty to sit" in very close cases by adding the "might reasonably be questioned" standard of § 455(a), it did so out of concern that a judge who presides with complete impartiality may nonetheless undermine public confidence in the judiciary when there is an appearance of a conflict of interest. *See* H.R. Rep. No. 93-1453 (1974), *as reprinted in* 1974 U.S.C.C.A.N. 6351, 6355 ("[The new] general standard [of § 455(a)] is designed to promote public confidence in the impartiality of the judicial process by saying, in effect, if there is a reasonable factual basis for doubting the judge's impartiality, he should disqualify himself and let another judge preside over the case. The language also has the effect of removing the so-called 'duty to sit' which has become a gloss on the existing statute."); *see also United States v. Snyder*, 235 F.3d 42, 46 n.1 (1st Cir. 2000); *Potashnick v. Port City Const. Co.*, 609 F.2d 1101, 1111-12 (5th Cir. 1980).

Consequently, we are not primarily concerned with whether the allegations with respect to the mortgage application are true. Instead, our central focus is on whether those allegations, when coupled with the judge's rulings on and conduct regarding them, would lead the public reasonably to believe that these problems affected the manner in which he presided. In other words, we ask "[w]ould a reasonable person, knowing all the facts conclude that the trial judge's impartiality could reasonably be questioned? Or, phrased differently, would an objective, disinterested observer fully informed of the underlying facts, entertain significant doubt that justice would be done absent recusal?" *United States v. Lovaglia*, 954 F.2d 811, 815 (2d Cir. 1992) (internal citations omitted).[4] We believe that such a disinterested observer would entertain those doubts.

Here, we find that an appearance of partiality arose from the cumulative effect of the judge's reactions to the various problems surrounding the application. McNamara's accusations suggested that when the judge applied for a loan in the 1980s, there was a relationship of some sort between the judge and McNamara's former employer, Gold Post Mortgage. In addition, the unsigned, unfiled loan application appeared to have a number of misrepresentations. A disinterested observer might conclude that the judge was obligated to address these allegations and to pu

---

[4] Contrary to the district court's contention, this court's statement that "a judge is as much obliged not to recuse himself when it is not called for as he is obliged to when it is," *In re Drexel Burnham Lambert, Inc.*, 861 F.2d 1307, 1312 (2d Cir. 1988) does not counsel a district judge to lean in favor of presiding over a case every time his partiality is questioned. Instead, this statement simply cautions that a judge should not disqualify himself in the absence of a violation of § 455. *See In re Aguinda*, 241 F.3d 194, 201 (2d Cir. 1991).

them to rest. At the same time, such an observer could form the impression that the judge's handling of these issues was intended to protect his own reputation, perhaps by discrediting McNamara.

McNamara was the government's key witness and his accusations regarding the judge involved the same type of behavior for which the Amicos were on trial. A disinterested observer would have perceived this, and would also have seen that the judge repeatedly raised the subject of McNamara's accusations *sua sponte*, conducted discovery on his own initiative, and in lengthy pretrial sessions dedicated to this issue, marshaled the evidence that he had discovered. A disinterested observer would have discerned on occasion a defensive or perhaps even hostile approach by the judge when addressing the accusations against him, casting them, for example, "upsetting and offending." Such a disinterested observer would also have viewed with concern the judge's efforts to dissuade the government from calling McNamara. It could have appeared to the observer that the judge had knowledge concerning potential evidence in the case and was permitting his concerns surrounding such knowledge to affect the way that he conducted proceedings.

Other events might have caused a disinterested observer to question the judge's impartiality. The disinterested observer would have noted that the government joined the defendants' motions for recusal—a very unusual development demonstrating that all parties were seriously concerned about the appearance of partiality. The observer would also have seen the judge take pains to explain to the parties his lack of bias in making evidentiary decisions, yet repeatedly attempt to persuade defense counsel to move for a finding of perjury. The observer would have seen the judge chastise the government for its actions in relation to McNamara, conclude that he had committed perjury, and instruct the jury *sua sponte* about perjury mid-trial. The observer would have further noted that the judge recused himself from the sentencing of McNamara, and sentenced the Amico brothers to the top of their guidelines ranges Finally, we note that Federal Rule of Appellate Procedure 21(b)(4) permits a district court, whose decision is the subject of a petition for a writ of mandamus to the court of appeals, to request to be invited to respond. But the Rule makes clear that it "may not do so unless invited or ordered to do so by the court of appeals." Fed. R. App. P. 21(b)(4) In this case, it would have appeared to the disinterested observer that the judge's response to the defendants petition for mandamus—which was made through his law clerk without such an invitation or order—violated the Rule and unnecessarily injected the district court into the appellate process. In isolation, each of these decision might have been reasonable or defensible. Casting no aspersions on the district judge, we believe that, in the aggregate, they would lead a disinterested observer to conclude that the appearance of partiality existed.[5]

*iii. Remedy*

Section 455 does not specify any particular remedy, as "Congress has wisely delegated to the judiciary the task of fashioning the remedies that will best serve the purpose of the legislation." *Liljeberg*, 486 U.S. at 862. In *Liljeberg*

---

5   In view of this conclusion, we do not reach appellants' contention that the court also violated § 455(b)(5)(iv). Additionally, because we are reversing the convictions and remanding to a different judge for a new trial we do not reach the appellants' argument that *Arizona v. Fulminante*, 49 U.S. 279 (1991) mandates a new trial whenever a biased judge preside over criminal proceedings.

2036

2037

the Supreme Court held in the context of a Rule 60(b) motion that in determining how best to address a violation of § 455(a), three factors are considered: (i) the risk of injustice to the parties in the particular case; (ii) the risk that the denial of relief will produce injustice in other cases, and (iii) the risk of undermining the public's confidence in the judicial process. *Id.* at 863. We have implied in the past that this test applies on direct appeal to violations of § 455, *Faulkner v. Nat'l Geographic Enters., Inc.*, 409 F.3d 26, 42 n.10 (2d Cir. 2005), and we now join a number of other circuits in explicitly holding so. *See, e.g., Harris v. Champion*, 15 F.3d 1538, 1570-72 (10th Cir. 1994); *In re School Asbestos Litig.*, 977 F.2d 764, 785 (3d Cir. 1992); *Parker v. Connors Steel Co.*, 855 F.2d 1510, 1526-27 (11th Cir. 1988). While not a traditional harmless-error analysis, this test looks to the relative harm to the parties, the public, and the judicial process.

Applying *Liljeberg*, we conclude that the judgments of conviction should be vacated because, under the second and third *Liljeberg* factors, the case for reversal is unique and unusually strong. Examining the first factor, the risk of injustice to the parties, we cannot find that the errors that occurred were not prejudicial, so as to weigh against vacating the convictions. It is true that the district court's decision to find and to tell the jury that McNamara had committed perjury would seem to have favored the defendants. But, given the prominence that the apparent conflict between the judge and McNamara assumed, there is simply no way for us to know with certainty if the jury would have reached the same result absent any such errors—especially given that the jury acquitted Richard on all but two of the charges against him.

2038

As to the second factor, vacatur would help insure that in the future, defendants will experience trials conducted differently. *Liljeberg*, 486 U.S. at 868 ("[T]he Court of Appeals' willingness to enforce § 455 may prevent a substantive injustice in some future case by encouraging a judge or litigant to more carefully examine possible grounds for disqualification and to promptly disclose them when discovered.").

It is the third factor—the risk of undermining the public's confidence in the judicial process—that militates even more strongly in favor of a new trial. At the end of the day, we are left with the highly unusual case in which the presiding judge was confronted with accusations of impropriety that concerned the very type of criminal activity for which the defendants were on trial, and were neither merely conclusory nor completely unsupported by fact. While it is certainly understandable that the judge would seek to defend himself from such accusations, our concern here must properly focus on the public's perception. As a disinterested observer would have seen, the judge went to considerable, even extraordinary, lengths—as we extensively detailed in the previous section—to examine and to defend himself against the allegations of wrongdoing, repeatedly bringing them up himself, conducting discovery on his own initiative, and publicly admitting to having sleepless nights over the issue. He further attempted to prevent the source of the accusations from testifying at trial, and when those efforts were unsuccessful, *sua sponte* instructed the jury that the accusations were, as a matter of fact, untrue. In the end, these were not accusations that, however untrue, were resolved and laid to rest quickly, easily, and in a manner in which the public would find created no appearance of partiality. Fully acknowledging the delicate circumstances

2039

presented, we cannot accept the results of such a trial without damaging the public's faith in its judiciary, and we conclude that the *Liljeberg* factors weigh decisively in defendants' favor.

### b. *Court Reporters Act*

This appeal is complicated by the fact that during the proceedings in the district court, more than 100 sidebar conferences and 27 conferences in chambers were not recorded. The Court Reporters Act ("CRA"), 28 U.S.C. § 753, requires that:

[e]ach session of the court and every other proceeding designated by rule or order of the court or by one of the judges shall be recorded verbatim . . . . Proceedings to be recorded under this section include (1) all proceedings in criminal cases had in open court; . . . and (3) such other proceedings as a judge of the court may direct or as may be required by rule or order of court [or] as may be requested by any party to the proceeding.

§ 753(b).

The appellants claim that the district court violated the CRA by failing to record four conferences in chambers before trial and all sidebar discussions during trial. It is well settled in other circuits that conferences in chambers are not in "open court" and their recording is left by § 753(b) to the discretion of the district court except when requested by a party. *See Von Kahl v. United States*, 242 F.3d 783, 792 (8th Cir. 2001); *In re Beard*, 811 F.2d 818, 833 (4th Cir. 1987); *United States v. Hein*, 769 F.2d 609, 610-11 (9th Cir. 1985); *United States v. Murphy*, 768 F.2d 1518, 1536 (7th Cir. 1985); *United States v. Jenkins*, 442

F.2d 429, 438 (5th Cir. 1971). We agree that chambers conferences are technically not in open court. Sidebar conferences, on the other hand, fall under the requirements of § 753(b) because they occur in open court. *See United States v. Haber*, 251 F.3d 881, 889 (10th Cir. 2001); *United States v. Winstead*, 74 F.3d 1313, 1321 (D.C. Cir. 1996). *But see United States v. Piascik*, 559 F.2d 545, 548 (9th Cir. 1977) (sidebar conferences need only be recorded when requested by counsel).

Throughout the course of the proceedings in district court, there is no indication that counsel requested that the chambers or sidebar conferences be recorded. While it is the responsibility of the court to preserve the record, a defendant may waive the requirements of § 753(b), either expressly or by implication. *See United States v. Nolan*, 910 F.2d 1553, 1560 (7th Cir. 1990); *United States v. Gallo*, 763 F.2d 1504, 1530 (6th Cir. 1985). Although over a hundred unrecorded bench and chambers conferences occurred, the record does not indicate that defense counsel ever objected to this practice, despite myriad opportunities to do so. Moreover, when the defendants requested that the court record a specific conference, the court agreed to do so. Consequently, we conclude that the defendants waived compliance with the CRA.

Nevertheless, we note that this case demonstrates the importance of maintaining a complete record of all proceedings of substance—in chambers as well as in court—in criminal cases. We underscore that the preferred way to proceed in criminal cases is under the assumption that nothing is "off the record".

### c. *Robert Jr.'s Kastigar Claim*

Robert Jr. contends that incriminating financial statements that were admitted at trial were improperly obtained through the Probation Office in a prior case. In 1997, he pleaded guilty to wire fraud and conspiracy to commit securities fraud, and was eventually sentenced to probation. The Probation Officer responsible for his Presentence Report asked for a personal financial statement. When he did not provide one, the Probation Officer contacted his attorney. The Probation Office eventually received a financial statement and list of the addresses of twelve properties Robert Jr. owned. In the meantime, the Probation Officer conducted his own investigation, which included interviewing Robert Jr.'s ex-wife. Robert Jr. also provided additional documents to the Probation Office, which reflected the use of two different social security numbers. This information raised questions about Robert Jr.'s candor, and the Probation Office forwarded the information to the F.B.I. The Presentence Report concluded that Robert Jr. had not been completely truthful with respect to his financial status.

Three years later, the information secured by his Probation Officer led to the indictment in this case. Robert Jr. (1) moved to suppress the statements and the information on the ground that they were obtained in violation of his Fifth Amendment right to remain silent, and (2) sought a hearing pursuant to *Kastigar v. United States*, 406 U.S. 441 (1972), to determine whether this prosecution was tainted by the information. While *Kastigar* typically applies to statements made during immunized testimony, the district court treated the request as one pertaining to the information gathered by the Probation Office, and denied the motion.

A determination not to hold an evidentiary hearing is reviewed for abuse of discretion. *Zappia Middle East Const. Co. Ltd. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000). To preserve his Fifth Amendment privilege, a defendant must normally assert his right at the time he is asked to provide information. The Supreme Court has held that in the context of an interview with a Probation Officer that is not always necessary. If the state creates a "penalty situation" in which invoking the Fifth Amendment would have adverse consequences, then the failure to assert the privilege is excused. *See Minnesota v. Murphy*, 465 U.S. 420, 435 (1984). We held in *United States v. Oliveras* that this principle applies to sentencing. 905 F.2d 623, 628 (2d Cir. 1990) (per curiam). The guidelines at the time that Robert Jr. pled guilty made it clear that in order to be eligible for a two-point reduction in offense level for acceptance of responsibility, he was "not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction in order to obtain a reduction." U.S.S.G. § 3E1.1, comment. (N.1(a)). Consequently, while it remains true that a Probation Officer may not compel a defendant to provide information in order to receive points for acceptance of responsibility, the choice ruled unconstitutional in *Oliveras*—between answering incriminating questions or remaining silent and foregoing credit for accepting responsibility—was not one that Robert Jr. had to face.

The Probation Officer was conducting a routine investigation into Robert Jr.'s financial assets and background. *See* Fed. R. Crim. Pro. 32(d)(2) (stating that a Presentence Report "must . . . contain (A) the defendant's history and characteristics, including . . . (ii) the defendant's financial condition."). While Robert Jr. provided the Probation Officer with incriminating financial information, he was

not presented with a choice between providing information or suffering a penalty at sentencing. Moreover, he consulted with his lawyer before giving the Probation Office his financial information, and his lawyer presumably informed him that he could remain silent and stay eligible for the two-point reduction under § 3E1.1. It is clear that since no Fifth Amendment violation occurred, no evidentiary hearing was required.

#### d. Jury Instruction on Fraud

Robert Jr. claims that the district court erred by both not charging the jury and not allowing him to argue that it is a defense to mail fraud to demonstrate that the victim could have discovered based on external sources that the representation was false. We review a district court's jury instructions *de novo*, *Jin v. Metro. Life Ins. Co.*, 310 F.3d 84, 91 (2d Cir. 2002), and a district court's limitations on the scope of cross-examination for an abuse of discretion, *United States v. Wilkerson*, 361 F.3d 717, 734 (2d Cir. 2004).

This defense is based on *United States v. Brown*, where the Eleventh Circuit held that "mail fraud requires the government to prove that a reasonable person would have acted on the representations." 79 F.3d 1550, 1557 (11th Cir. 1996). The majority of circuits to address the issue have rejected this defense, holding that a victim's lack of sophistication is not relevant to the intent element of mail or wire fraud. *See United States v. Davis*, 226 F.3d 346, 358-59 (5th Cir. 2000); *United States v. Ciccone*, 219 F.3d 1078, 1083 (9th Cir. 2000); *United States v. Coyle*, 63 F.3d 1239, 1244 (3d Cir. 1995); *United States v. Biesiadecki*, 933 F.2d 539, 544 (7th Cir. 1991); *United States v.*

*Maxwell*, 920 F.2d 1028, 1036 (D.C. Cir. 1990); *United States v. Brien*, 617 F.2d 299, 311 (1st Cir. 1980).

We have expressly rejected the *Brown* defense in the context of 18 U.S.C. § 2314, which prohibits the inducement of travel in interstate commerce for a fraudulent purpose. *See United States v. Thomas*, 377 F.3d 232, 243 (2d Cir. 2004). In *Thomas*, we disagreed with *Brown*'s "unreasonable victim" standard. We held that "the victim's gullibility . . . is not relevant to the inquiry as to whether the defendants were properly convicted." *Id.* at 242-43 (internal quotations omitted). We see no significant difference between § 2314 and § 1341 that would justify not extending our holding in *Thomas* to both statutes. Consequently, we affirm the district court's holding that the "reasonable victim" defense does not apply to allegations of mail fraud under § 1341.

#### e. Richard's 29(c) Claim

Richard's counsel moved to dismiss count 44, charging mail fraud relating to the sale of a specific house, on the ground that the government's proof of guilt was insufficient, and now renews the objection. *See* Fed. R. Crim. P. 29(c). We review a denial of a Rule 29(c) motion *de novo*. *United States v. Irving*, 452 F.3d 110, 117 (2d Cir. 2006), and all evidence must be viewed in the light most favorable to the government. *Id.*

A conviction for mail fraud under 18 U.S.C. § 1341 requires that the government prove a mailing took place in furtherance of a fraud and the defendant caused the mailing. Richard contends that the government's proof on both of these elements was insufficient.

As proof of the mailing, the government introduced a stipulation that John Gable, the attorney who closed the sale of the property in question, worked at a law firm whose custom and practice was to send documents by overnight mail to the client after the documents had been executed. While Richard does not dispute the existence of the custom, he nevertheless contends that there was insufficient evidence that the documents in question were finalized and executed, and therefore insufficient evidence that they were mailed. However, the government introduced the file of the lender to whom the documents were to be mailed, which included HUD-1 forms and the loan application, appraisal, purchase contract, and deed. Given the existence of these documents in the loan file, the jury was entitled to infer that Gable had, in fact, mailed the documents in accordance with his customary practice. *See, e.g. United States v. LaBarbara*, 129 F.3d 81, 84 (2d Cir. 1999) (use of the mail may be proved by circumstantial evidence) (collecting cases).

To prove that a defendant caused a mailing, it is sufficient to prove that he could have reasonably foreseen that the mailing would take place. *United States v. Bortnovsky*, 879 F.2d 30, 36-37 (2d Cir. 1989). Richard contends that because there is no evidence that he knew of the transactions, knew the lender, knew Gable, or knew the practices of Gable's firm, he could not have known that the documents would be mailed. However, the government proved that Richard attended the closing of the sale of the property that was the subject of the count, and that his family had been engaged in a wide conspiracy of mortgage fraud which Richard knowingly joined, as reflected in his conviction under § 371. We find this proof of forseeability to be adequate.

## CONCLUSION

We vacate the convictions and remand for further proceedings before a different district court judge.